# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

TIKO HARDY,

                Plaintiff,

     v.

STATE BOARD FOR COMMUNITY COLLEGES AND OCCUPATIONAL EDUCATION, as the governing body of the Colorado Community Colleges System and Pikes Peak State College; and
LANCE BOLTON, in his official and individual capacity,

                Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Tiko Hardy ("Plaintiff"), by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint and Jury Demand ("Complaint") against Defendants, the State Board for Community Colleges and Occupational Education (the "Board" or "SBCCOE") and Lance Bolton ("Dr. Bolton") (collectively, "Defendants"), states and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an employment discrimination case arising from Defendants' discrimination toward Plaintiff on the basis of her race and/or color and/or in retaliation for engaging in the protected activity of opposing race-related discrimination, in violation of Section 1981 of the Civil Rights Act of 1966 ("Section 1981") and the Colorado Anti-Discrimination Act ("CADA").

2.     Plaintiff, a Black woman, began working as an Adjunct Professor with the Social Work Department at Pikes Peak State College ("PPSC") in or about March 2015 and transitioned

to a full-time member of the PPSC faculty in 2016. Plaintiff consistently received exemplary performance reviews, in addition to recognition for her Diversity, Equity, and Inclusion ("DEI") and social justice work within PPSC and the larger community.

3.      In or around June 2021, Defendant Dr. Lance Bolton invited Plaintiff to apply for PPSC's Chief Diversity Office ("CDO") position, and Plaintiff was subsequently selected for the role. However, over time, Plaintiff began to notice that Dr. Bolton dismissed and shut down her ideas and opinions when she spoke about the need for systemic and policy changes to support DEI initiatives at PPSC. Matters grew worse when, on February 14, 2023, Dr. Bolton accused Plaintiff of overbooking conference travel as a result of a mistake he had made in budget calculations. Though Dr. Bolton brushed off his error, Plaintiff saw that Dr. Bolton's failure to give Plaintiff the benefit of the doubt before even speaking with her implicated discrimination concerns. Plaintiff openly voiced her discrimination concerns in an email to Dr. Bolton, requesting that he communicate differently with her in the future. Dr. Bolton did not provide any meaningful response to Plaintiff's concerns.

4.      Following the email exchange, Dr. Bolton became noticeably uneasy when Plaintiff attempted to speak up about discrimination at PPSC on behalf of herself and other employees of color. For example, Dr. Bolton ignored reports of discrimination concerning Joseph Southcott, the Dean of the Mathematics and English Division, when they were made by Plaintiff and another Black, female executive, Jacquelyn Gaiters-Jordan, dismissing their concerns as just "Joe being Joe." It was only when Dr. Debra Licht, a white woman, reported discriminatory behavior by Dean Southcott that Dr. Bolton bothered to listen. On other occasions, Dr. Bolton would turn Plaintiff's reports of concerns related to discrimination back on her, asking Plaintiff to consider whether *she*

needed to change in some way, to avoid dealing with Plaintiff's reports of discrimination. For example, when Plaintiff told Dr. Bolton that she felt she was not able to safely discuss the impact of racism at work, which made her feel she was being stripped of her identity as a Black woman, Dr. Bolton dismissively replied, "We all have to give things up."

5.      On April 18, 2023, Plaintiff sent another email to Dr. Bolton voicing concerns of discrimination regarding Dr. Patricia Grandieu (Diawara), the Executive Director of Institutional Effectiveness, a white woman. Dr. Bolton had asked Plaintiff and Dr. Grandieu to work together on efforts to get PPSC qualified as a Hispanic-Serving Institution ("HSI") and, despite Dr. Grandieu's reputation as being difficult for employees of color to work with, Plaintiff did everything she could to work effectively with Dr. Grandieu. However, Dr. Grandieu was repeatedly disrespectful both to Plaintiff personally and with respect to the DEI initiatives they were trying to implement, including by insulting Plaintiff's intelligence, threatening to withdraw her help if Plaintiff disagreed with her strategy, and calling Plaintiff's meetings a "waste of time." In her email to Dr. Bolton, Plaintiff politely asked for clarification around Dr. Grandieu's role on the project and included Dr. Grandieu on the email in an effort to communicate transparently. Dr. Bolton's response was to turn Plaintiff's discrimination concerns back on her again, asking Plaintiff to examine whether her meetings were "productive" and defending Dr. Grandieu based on his own experience working with her as a white male. Dr. Bolton and Kim Hennessy, PPSC's Vice President of Human Resources, never investigated Plaintiff's reports of discrimination concerning Dr. Grandieu.

6.      On April 30, 2023, Plaintiff sent an email to Ryan Ross, the Colorado Community College System's ("CCCS") Associate Vice Chancellor for Student Affairs, Equity, and Inclusion,

in which she recounted her experience in making reports of discrimination to Dr. Bolton and his dismissive responses, as well as the pressure Plaintiff faced in feeling like she could not speak up about discrimination in the workplace as the first Black woman on Dr. Bolton's team. Plaintiff also voiced her concern that Dr. Bolton would retaliate against her for her protected reports, because she believed she was at risk of losing her job or receiving a bad evaluation if she continued to speak up about her concerns of discrimination.

7.      On May 11, 2023, Plaintiff and Dr. Bolton had a one-on-one meeting in which Plaintiff repeated her discrimination concerns regarding Dr. Grandieu. Once again, Dr. Bolton dismissed Plaintiff's concerns of discrimination, telling her that what she was experiencing was "not discrimination" and defending Dr. Grandieu. Shortly after their meeting, Plaintiff learned for the first time that Defendants intended to post the position for Vice President of Student Experience, Diversity, Equity, and Inclusion ("VPSE"), rather than elevating Plaintiff's CDO role to a VP position as had previously been discussed. Plaintiff immediately recognized that this was an effort by Defendants to terminate her employment in retaliation for her protected reports of discrimination by eliminating the CDO role and hiring someone else for a new VP position. The following day, May 12, 2023, Plaintiff emailed Dr. Bolton expressing her belief that she was being discriminated against in retaliation for reporting her concerns of discrimination.

8.      On or about May 25, 2023, Dr. Bolton provided Plaintiff with her performance evaluation for the 2022-2023 school year. For the first time in Plaintiff's tenure with the College, she received an overall rating below "exemplary," and Dr. Bolton gave her the lowest possible rating, "needs improvement," in "Interpersonal Skills and Communication." In addition to giving Plaintiff low performance ratings, Dr. Bolton's evaluation failed to enumerate many of Plaintiff's

major accomplishments from the year, including the development of equity in instruction programming, her efforts to make the College a leader as an emerging HSI, and her work putting inclusive hiring practices in place. In short, the performance evaluation was a transparent effort to discredit Plaintiff and her accomplishments in order to create a pretextual paper trail to justify Defendants' decision to terminate her employment because of her protected activity. Plaintiff reported her belief that the evaluation was retaliatory in an email to Dr. Bolton later the same day.

9.      In a meeting to discuss Plaintiff's evaluation the following day, Dr. Bolton characterized Plaintiff's reports of discrimination concerning Dr. Grandieu as a mere "squabble" between his direct reports. In response, Plaintiff explained the offensive nature of Dr. Bolton's dismissive characterization and attempted to impress the seriousness of her experience with discrimination upon him, to no avail. Following their meeting, Plaintiff reported the retaliatory evaluation to Ms. Hennessy in human resources and further explained that she believed it was part of an ongoing effort by Defendants to "terminate [her] employment indirectly" as a result of her protected activity in speaking up about discrimination. A few days later, on May 30, 2023, Plaintiff submitted a discrimination complaint against PPSC and Dr. Bolton through the College's internal complaint system, Maxient.

10.     The following day, May 31, 2023, Plaintiff received a termination letter, signed by Dr. Bolton, explaining that the CDO position was being eliminated, and her last day of employment would be July 31, 2023. Although Plaintiff interviewed for the VPSE role, she was not selected for the position. Defendants instead offered the position to Dr. Enrique Romo, who had a background in healthcare and no experience working with community colleges.

11.     Plaintiff never received a response to the complaint she submitted on May 30, 2023, so she refiled the complaint through Maxient on June 28, 2023. Defendants likewise failed or refused to respond to Plaintiff's June 28, 2023 complaint of discrimination.

12.     Following Plaintiff's termination, on August 21, 2023, Plaintiff emailed CCCS Chancellor Joe Garcia, outlining the discrimination she had experienced, and PPSC's failure to investigate her reports. Chancellor Garcia gave Plaintiff no meaningful response and simply directed her back to the legal department. In short, despite Plaintiff's repeated efforts to communicate and work with Defendants in good faith, Defendants stood by their discriminatory and retaliatory decision to terminate Plaintiff, their Chief Diversity Officer, because she had the courage to speak honestly about her experience with discrimination during her employment.

## PARTIES

13.     Plaintiff hereby incorporates by reference all paragraphs in this Complaint as though set forth fully and separately herein

14.     At all times relevant to this Complaint, Plaintiff is and was a resident of Colorado.

15.     The State Board for Community Colleges and Occupational Education ("SBCCOE" or the "Board")) is the governing board of the community college system, which includes Pikes Peak State College ("PPSC"). *See* C.R.S. § 23-60-205.

16.     At all times relevant, the Board was Plaintiff's employer.

17.     Defendant Lance Bolton was, at all times relevant to this Complaint, an employee of the Board and Pikes Peak State College, and he was Plaintiff's supervisor.

18.     Upon information and belief, Dr. Bolton is an individual residing in the State of Colorado.

**JURISDICTION AND VENUE**

19.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

20.    This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

21.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because the claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

**ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED**

23.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

24.    Plaintiff filed Charges of Discrimination Numbers E2400021046, E2400021050, and E2400023690x against the Colorado Community College System, Pikes Peak State College, and Dr. Bolton, respectively, with the Colorado Civil Rights Division ("CCRD") on or about March 18, 2024 alleging gender, race and/or color discrimination, retaliation, and aiding and abetting liability with respect to Dr. Bolton (the "Charges").

25.    Defendant the Board received notice of Plaintiff's Charges, provided a response thereto, and the CCRD had an opportunity to attempt conciliation regarding the claims alleged in the Charges.

26.    The CCRD issued Plaintiff Notices of Rights to Sue with respect to the Charges on

October 17, 2024, and Plaintiff filed the instant action within ninety (90) days of same.

27.     On November 29, 2023, Plaintiff served Defendants a Notice of Claims under the Colorado Governmental Immunity Act, in accordance with C.R.S. § 24-10-109, as amended.

28.     Plaintiff has met all administrative prerequisites prior to filing this action.

## **FACTUAL ALLEGATIONS**

29.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

30.     Plaintiff began working for the Board as an Adjunct Professor with the Social Work Department at Pikes Peak State College ("PPSC") (the Board and PPSC are collectively referred to herein as the "College") in or around March 2015.

31.     Plaintiff transitioned to a full-time faculty member position with the Social Work and Psychology Departments at PPSC in 2016.

32.     Plaintiff was a professor with the College for seven years, receiving "exemplary" performance reviews every year she taught, which represented the highest rating a professor could receive.

33.     Both before and during her tenure with the College, Plaintiff was engaged in Diversity, Equity, and Inclusion ("DEI") work for many years, including leading initiatives around racial justice for hundreds of people following the murder of Michael Brown in Ferguson, Missouri, and training local law enforcement how to interact with the community more effectively during periods of racial and social unrest, with an emphasis on working with communities of color.

34.     As a member of PPSC faculty working for the College, Plaintiff brought her expertise in DEI and social justice to the campus, working to make the college a more inclusive

place for students of color and faculty of color alike.

35.     As a result of Plaintiff's excellent performance reviews and her DEI work, in or around June 2021, Plaintiff was invited to apply for, and was ultimately offered, the position of Chief Diversity Officer ("CDO") with the College.

36.     Plaintiff's start date in the CDO position was on or about August 1, 2021.

37.     At all times relevant, Plaintiff met or exceeded the College's legitimate performance expectations.

38.     After Plaintiff's first year as CDO, she received a performance evaluation from Dr. Bolton for the period from May 31, 2021 to April 30, 2022.

39.     In Plaintiff's first performance evaluation as CDO, Plaintiff received "exemplary" marks in every category, and Dr. Bolton's written comments noted that Plaintiff "enjoys tremendous respect from our faculty and staff" and was "a great addition to our leadership team."

40.     In the "Potential Goals" section for the following year, 2022, the evaluation noted the intent to address team hiring needs to continue the important work Plaintiff was spearheading.

41.     Furthermore, under "Department recommendations," Dr. Bolton listed, "Shift CDO to VP," indicating that the College's intent was to change Plaintiff's CDO title to a Vice President ("VP") role—not to hire a new person as a VP.

42.     In short, Plaintiff was engaged in important work that was well-respected and recognized at all levels of the College, as well as (at least initially) by Dr. Bolton.

43.     However, despite the College's recognition of the need to hire additional staff for Plaintiff's team, throughout the time Plaintiff was in the CDO role, she remained a department of one.

44.    Plaintiff's predecessor in the CDO role had two full-time staff members, as well as student workers and administrative support, but Defendants expected Plaintiff to run the department entirely by herself.

45.    Plaintiff asked Dr. Bolton for support numerous times over the course of her tenure in the CDO role and she was denied each time, despite the fact that there was funding allocated in the budget specifically for hiring support staff.

46.    Nonetheless, Plaintiff worked incredibly hard, often working 10-12 hour days, and she was successful in continuing to push through important DEI work, including work that is published in the CCCS Annual Equity Plan.

47.    However, as Plaintiff continued to grow in her role through the latter half of 2022 and the beginning of 2023, she noticed with increasing frequency that she was being dismissed, shut down, and made to feel as if her opinions were not welcome when she shared with Dr. Bolton the need for systemic and policy changes.

48.    Plaintiff, who is a Black woman, strived to obtain the same level of dignity and respect Dr. Bolton afforded her white colleagues.

49.    Dr. Bolton's tone toward Plaintiff became even more negative in February 2023.

50.    For example, on February 14, 2023, in response to an email from Plaintiff outlining the conferences she would be attending for the year, Dr. Bolton sent Plaintiff an email accusing her of giving the "appearance of using [her] position[] to give [herself] privilege" and suggesting that the amount of travel she had planned for the year did not pass the "Newspaper Test" (i.e., if her travel were published in the newspaper, Dr. Bolton did not believe he would be able to justify how PPSC benefitted from it).

51.    In response, understandably confused, Plaintiff explained she had only attended one conference so far during the fiscal year, and that she had never planned conference travel without Dr. Bolton's explicit approval in advance.

52.    However, Plaintiff canceled all upcoming travel planned through the College in response to Dr. Bolton's accusations.

53.    The following day, Dr. Bolton responded, noting that he had combined Plaintiff's conference travel from both 2021 and 2022 and was mistaken in his calculations of how much travel she was engaged in.

54.    Dr. Bolton was only willing to accept that he had made a mistake after checking with a white colleague, despite the fact that Plaintiff had already explained the error to him.

55.    Although Dr. Bolton apparently brushed off his mistake as nothing more than a simple error, Plaintiff saw that Dr. Bolton's ease in jumping to a conclusion that she had done something wrong implicated clear discrimination concerns, particularly given his pattern of engaging in more favorable treatment toward Plaintiff's white colleagues.

56.    Plaintiff replied to Dr. Bolton:

I am sharing this email not to be contentious but to open the lines of communication as I share an honest and vulnerable response with you. Please accept in the vein it is intended.

You may not recognize the negative impact of this email trail. As a black woman in higher education, and on your executive team, my integrity, work ethic, and ability to perform in my role were questioned without ever seeking to understand (especially when you had incorrect information, I have only attended 1 conference this fiscal year). I never have a problem with providing clarity. However, it is very difficult to be a part of a team (and work in an environment) where I am continuously challenged, questioned, dismissed, shut down, and/or made to feel that I cannot share an authentic opinion. I edit myself constantly because I feel I am always in a state of trying to establish my credibility—for example, much of the

content in this email below is me justifying attending upcoming professional conferences that are 100% aligned with the work that I am trying to accomplish at the college: all of which we spoke about in person previously.

I wish your email had started with seeking to understand and assuming goodwill while sharing the budget concerns relating to conferences. Then "we" could have discussed my attending the upcoming conferences that you deemed "newspaper worthy"—you would have received zero pushback from me. If you genuinely valued me and my contributions to the executive team, you could have simply trusted me and asked for clarity to resolve any discrepancies. Affording me an opportunity to discuss with you could have resulted in us exploring/canceling/keeping any of the upcoming travel plans together. (see below) The discussion could have included asking "how" I plan to incorporate the content from the conferences—or asking me to present more formally to our team to share information more widely.

I feel compelled to justify myself because my leadership and integrity were called into question[.]

57.     Plaintiff then went on to further explain her justification for attending each of the three conferences she had been planning to attend, noting that one was at the specific request of Dr. Bolton himself, one was at the request of the Colorado Department of Higher Education (CDHE), and the third would have been paid for by the Western Interstate Commission for Higher Education (WICHE), which Plaintiff planned to attend at the request of the Vice President of Instructional Services.

58.     Each of the conferences had a direct connection to Plaintiff's role as the CDO.

59.     Plaintiff concluded her email with the incredibly reasonable request for Dr. Bolton to communicate differently with her in the future, in light of her discrimination concerns, and to be open to hearing alternative viewpoints in his role as a leader.

60.     Dr. Bolton dismissed Plaintiff's stated concerns, making no productive response to the points she had raised about his discriminatory biases or actions.

61.     Following this email exchange, Plaintiff became increasingly disconcerted with the way Dr. Bolton handled concerns of discrimination she brought to his attention, particularly when white colleagues were involved.

62.     Dr. Bolton was noticeably uncomfortable any time Plaintiff challenged actions by the College's white employees by discussing concerns of discrimination..

63.     When Plaintiff brought discrimination-related issues to Dr. Bolton's attention, he would instead question whether she had done something to create tension with other employees, asking her to take responsibility for situations in which she or other employees of color were experiencing discrimination. As a result of Dr. Bolton's increasingly dismissive attitude, Plaintiff felt that she had to continually revise and smooth over her own discrimination experiences in order to make Dr. Bolton feel comfortable.

64.     This dynamic left Plaintiff and other women of color in positions of leadership at the College feeling increasingly dismissed, unsupported, and uncomfortable.

65.     For example, a situation arose in which the then-Dean of the Mathematics and English Division, Joseph Southcott, a white male, was repeatedly disrespectful toward Jacquelyn Gaiters-Jordan, a Black woman and the Vice President of Instructional Services who has been with the College for over 23 years.

66.     Both Plaintiff and Ms. Gaiters-Jordan reported Dean Southcott's behavior to Dr. Bolton and the entire executive leadership team on multiple occasions, but Dr. Bolton ignored and dismissed their complaints, on one occasion even saying, "Joe is just being Joe".

67.     However, things changed when a white colleague, Dr. Debra Licht, witnessed Dean Southcott making a hostile and inappropriate remark during a meeting that Ms. Gaiters-Jordan was

facilitating. Following that meeting, Dr. Licht called Dr. Bolton to discuss her concerns about the discriminatory behavior she had witnessed.

68.     Dr. Bolton claimed to Dr. Licht that he had not been aware of issues with Dean Southcott's behavior, and that it was unacceptable and would be addressed.

69.     Dr. Bolton shared in an executive leadership meeting that an issue with Dean Southcott had been brought to his attention, and that he would work with Ms. Gaiters-Jordan and human resources to address his behavior.

70.     However, unfortunately, Dean Southcott's behavior was never addressed beyond an initial inquiry, and Ms. Gaiters-Jordan continued to be subjected to even more uncomfortable situations with Dean Southcott.

71.     Plaintiff discussed this situation with Dr. Bolton as an example of how she felt dismissed by him because of her race. Plaintiff asked Dr. Bolton why Dean Southcott's behavior had been ignored until a white employee reported the same concerns Plaintiff herself had reported.

72.     In response, Dr. Bolton claimed it was simply "an oversight."

73.     Another incident arose in or around December 2022, following a retirement announcement for the Vice President of Student Services ("VPSS"), Dr. Homer Wesley.

74.     The Associate Vice President of Student Services is and was Dr. Dawna Haynes, a Black woman.

75.     Upon information and belief, Dr. Haynes' department was the most diverse in the College.

76.     During an open meeting intended to ask employees who reported to the VPSS what they would like to see from the Student Services Department following the departure of Dr.

14

Wesley, Dr. Haynes provided a comment as to her vision and the needs for the department moving forward. Part of her comments included the need for greater trust to be built between her team and PPSC executive leadership.

77.     Dr. Bolton rudely and inappropriately shut Dr. Haynes down in front of the other meeting attendees; his tone was so disrespectful that, following the meeting, a white colleague approached Dr. Haynes to tell her she was offended by Dr. Bolton's reaction to her comment.

78.     Dr. Haynes replied, "Don't be offended, because this is the standard of treatment from Dr. Bolton."

79.     After working for the College for over a decade, Dr. Haynes was the natural pick for the VPSS role. However, when Dr. Haynes declined to take the VPSS position, she cited that she did not want to work with Dr. Bolton due to his disrespectful treatment of women of color who reported to him.

80.     On other occasions, Plaintiff went above and beyond her role as CDO and attempted to educate Dr. Bolton about the unique challenges she faced as a Black woman in higher education and the first Black woman on his executive team, including the fact that not being able to openly share criticism or discuss the impact of racism at work often made her feel as though she was being stripped of her identity.

81.     Rather than listening to Plaintiff's concerns, Dr. Bolton's dismissive response was "we all have to give things up" because "it's a part of being a leader."

82.     Plaintiff responded by pointing out the dismissive nature of his response.

83.     Dr. Bolton did not see the need to change his response in any way.

84.     On April 18, 2023, Plaintiff sent Dr. Bolton another email in which she raised

15

reasonable concerns of discrimination concerning Dr. Patricia Grandieu, the Executive Director of Institutional Effectiveness, a white woman.

85.    The Department of Institutional Effectiveness was the College's data collection division, and Dr. Grandieu and her team were asked to take part in many college-wide initiatives.

86.    Dr. Bolton had asked Plaintiff to work with Dr. Grandieu on efforts toward getting PPSC qualified as a Hispanic-Serving Institution ("HSI").

87.    Specifically, Plaintiff and Dr. Grandieu were asked to work together to analyze and report on findings regarding disparity in treatment for students of color, including making program recommendations based on the statistical findings.

88.    From the outset, Dr. Grandieu expressed a lack of enthusiasm for the project, telling Dr. Bolton she did not have time to supervise an additional project and sharing her belief that the Office of Equity and Inclusion, Plaintiff's department, should be responsible for oversight of the project, despite the fact that it was supposed to be a collaborative effort across both departments.

89.    Dr. Grandieu had a reputation across PPSC as being difficult to work with, especially for employees of color.

90.    In fact, in or about 2019 to 2020, just before the COVID-19 pandemic, Plaintiff had crossed paths with Dr. Grandieu. At the time, Plaintiff was a Professor in the Social Work Department.

91.    The Chair of the Social Work Department was Ann-Marie Manning, a Black woman.

92.    The social work department was engaged in a program review assessment with Dr. Sharon Bjorkman, a white woman, as the department's assessment coach and a member of the

faculty in the Sociology Department.

93.     Dr. Grandieu was involved with helping to prepare departments for the program review.

94.     During the assessment, Dr. Bjorkman shared that she felt that Dr. Grandieu was negatively biased toward the Social Work Department because it was led by two Black women.

95.     Based on her observations, Dr. Bjorkman reported her discrimination concerns about Dr. Grandieu to the Associate Dean, John Bower.

96.     Following Dr. Bjorkman's report, no prompt or reasonable investigation was undertaken by the College, and Dr. Grandieu faced no repercussions for her discriminatory behavior.

97.     Furthermore, Dr. Bolton was aware of Dr. Grandieu's reputation for discriminatory behavior, because it had been reported to him on multiple occasions by various employees, including Plaintiff and other faculty members in Ms. Gaiters-Jordan's department.

98.     Dr. Bolton ignored the reports of discrimination.

99.     As a result of Dr. Bolton's failure to address the concerns, Ms. Gaiters-Jordan instituted a liaison for instructional services, Dr. Licht, the same white employee who had stood up for her in the past, in order to insulate herself and other faculty of color from having to communicate directly with Dr. Grandieu.

100.     Plaintiff also asked a white colleague, Dr. Lori Salgado, if she would serve as a liaison between her and Dr. Grandieu.

101.     Notwithstanding Dr. Grandieu's reputation and Plaintiff's previous negative experience with her, when Dr. Bolton asked Plaintiff to work with her on the HSI project, Plaintiff

was determined to build a relationship with her and work together effectively.

102.    However, despite Plaintiff's efforts, Dr. Grandieu continued to treat Plaintiff disrespectfully.

103.    For example, during one conversation, when Plaintiff disagreed with a negative statement Dr. Grandieu made about PPSC's faculty, Dr. Grandieu condescendingly responded, "I don't understand how people with a doctorate degree don't understand this."

104.    Plaintiff replied honestly that she felt Dr. Grandieu's comments were offensive, in that it implied Plaintiff was somehow lacking in intelligence despite her credentials.

105.    On more than one occasion, when Plaintiff disagreed with Dr. Grandieu on strategy, Dr. Grandieu threatened to withdraw her help from Plaintiff's initiatives, rudely saying things like, "I don't have to be a part of this project, this falls under your department."

106.    Dr. Grandieu also expressed that she felt Plaintiff's meetings were a "waste of time"—in other words, that Plaintiff's equity and inclusivity projects were beneath her.

107.    Plaintiff strongly believed that Dr. Grandieu's unprofessional and demeaning behavior toward her was because of her race, both because of the nature of the equity projects they were working on and because of the history of discrimination complaints against Dr. Grandieu reported by Plaintiff and other Black employees.

108.    As a result of Dr. Grandieu's unwillingness to collaborate with Plaintiff, Plaintiff sent an email to Dr. Bolton on April 18, 2023, in which Plaintiff politely asked for clarification around Dr. Grandieu's role in the collaboration.

109.    Plaintiff included Dr. Grandieu on the email in an effort to be transparent with everyone about her concerns.

110.    Once again, Dr. Bolton found occasion to chastise Plaintiff for reporting reasonable concerns of discrimination by assuming Plaintiff must have done something wrong, while at the same time ignoring or dismissing the root cause of Plaintiff's concerns. Rather than holding Dr. Grandieu accountable for her disrespectful and discriminatory attitude toward Plaintiff and the diversity goals put in place by the College, Dr. Bolton asked Plaintiff to examine the structure of her meetings, asking whether they were "productive," and whether they encouraged everyone involved to share ideas and engage in an open dialogue. Then, without taking the time to listen or consider Plaintiff's concerns or experience, Dr. Bolton defended Dr. Grandieu based solely on his experience working with her as a white male.

111.    Dr. Bolton concluded by giving Plaintiff patronizing advice on how to be a leader, writing, "The heart of leadership doesn't involve giving orders and compelling people to do things, that almost never works. It involves building relationships and connections, it involves building trust, and it involves building win/win collaborations where everyone benefits from interactions."

112.    Dr. Bolton never bothered to consider how his own advice might apply to building a relationship of trust and beneficial collaboration with Plaintiff when she raised concerns of discrimination, and he ignored her request to have a meeting with him and Dr. Grandieu to attempt to resolve the issues.

113.    Dr. Grandieu never acknowledged Plaintiff's email at all.

114.    Dr. Bolton and Kim Hennessey, the Vice President of Human Resources, never investigated any of Plaintiff's discrimination concerns regarding Dr. Grandieu.

115.    Other employees, including Dr. Lori Salgado, HSI Program Director, and Dr. Dawne Martin, a PPSC Consultant, were present for some of the conversations between Plaintiff

and Dr. Grandieu that Plaintiff referenced in her email.

116.    Neither Dr. Salgado nor Ms. Martin were contacted to share their perspective and experience with how Plaintiff had been treated by Dr. Grandieu.

117.    In response to Dr. Bolton's email, once again, Plaintiff was put in the position of having to defend and justify her own actions as a result of voicing discrimination concerns.

118.    Plaintiff explained her history of participating in and moderating difficult conversations around race with stakeholders on every side of the issue, noting that she had never had a problem navigating conflict or listening to different perspectives as a leader, as Dr. Bolton had insinuated.

119.    Plaintiff further recounted the self-doubt in reporting discrimination caused by Dr. Bolton's consistent invalidation of her concerns, and she attempted again to provide Dr. Bolton with insight into her experience as a Black female leader, and her perspective regarding Dr. Grandieu's conduct toward Black employees such as herself. Plaintiff wrote:

> Often, by the time that I bring something to your attention, I have to run it by several others to ensure that I am not the only one having that experience. In this case, nearly all of the leaders that I spoke to, including some faculty, indicated that they had similar issues when interacting with [the Office of Institutional Effectiveness]. I shared with you and copied [Dr. Grandieu] to be transparent.
>
> You often share if something concerns you, so I want to share that some of [Dr. Grandieu]'s behavior and comments subject me to microaggressions regularly, and that worries me. I appreciate that you all have worked together for ten years and while I don't believe that she is being malicious, you and I [do] not have the same experience, which is why I requested for the three of us to meet.
>
> All of our jobs are interdependent and involve working successfully with each other—we all need to be intentional in working on our people skills, especially, if there are unintended consequences brought to our attention. I know that you may not be having the same experience but with all due

respect, that doesn't mean my experience is invalid—they are just different.

Dr. B, think about it; [Ms. Gaiters-Jordan], [Colorado Community College System Chancellor Joe Garcia], and I attended an 8-hour session for "leaders of color," Several sessions covered similar content, so that should signal that people of color are not having the same experiences as their white colleagues—I am actually in the process of writing about similar issues.

I can't even remember what the question was but one of the things that [Chancellor Garcia] mentioned in our group was that black women have the most challenging job of navigating the terrain in high education. At that moment, I felt a huge relief that someone acknowledged what we were experiencing.

We are suffering in silence and being subjected to unprecedented opposition from our white colleagues. There is a national conversation, in which leaders and activists are trying to encourage BIPOC leaders not to quit. We know that our voices and perspectives have been missing from the higher education conversation, for decades.

[Ms. Gaiters-Jordan] and I can share countless stories, and you would not believe some of our experiences and what our colleagues say about us. I can't speak for [Ms. Gaiters-Jordan], but I don't share those stories because it would make things even more uncomfortable.

There are times when people of color bring attention to an issue, and the comments are dismissed, but when our white colleagues raise the same issue, people listen to them. I experience this on a regular basis.

Dr. B, neither of us have all of the answers, but after our last conversation, I committed to sharing my experiences with you. I believe that a significant part of our "work relationship" involves us problem-solving together and me being able to communicate and educate you and the team (when appropriate) on my perceptions, realities, and lived experiences.

I am asking for the same open door you extended to the college without judgment on my leadership capabilities. I don't believe that every situation is about a leader's inability to navigate problems or personalities—I spent a lot of time in the classroom fostering diversity of thought and approaches to decision making.

…

Remember, the sense of belonging benchmark, for success, is based on how

people of color and those who have been historically marginalized feel that we [the College] are demonstrating our commitment. Being on the leadership team should not mean that I give away my vote to be a part of a thriving working environment that fosters a sense of belonging.

120.    On April 30, 2023, Plaintiff sent an email to Dr. Ryan Ross, the Associate Vice Chancellor for Student Affairs, Equity, and Inclusion for the College.

121.    In the email, Plaintiff recounted her experience with making reports of discrimination to Dr. Bolton, describing his dismissive belief that what she was experiencing was not discrimination.

122.    Plaintiff wrote, "As the first black woman at the table, what they want to say is, do I know what assimilation and accommodating the needs of my white colleagues look like," continuing, "comments that question my skills or abilities, primarily when I offer a different viewpoint, are demeaning and need to stop. I have the same high-level skills, credentials, professionalism, and resume that got me the job."

123.    Plaintiff concluded by requesting additional support and guidance from the CCCS Office of Student Affairs, Equity, and Inclusion around how to support faculty of color, noting, "Based on the response that I received, and how I was shut down, I don't want to risk placing my job in jeopardy or receiving a bad evaluation, but I am very concerned that we are heading in the wrong direction regarding racial justice."

124.    On May 11, 2023, Plaintiff finally had a one-on-one meeting with Dr. Bolton in which she repeated her discrimination concerns surrounding her interactions with Dr. Grandieu.

125.    Yet again, Dr. Bolton completely dismissed Plaintiff's concerns, telling her that what she was experiencing was simply "not discrimination" without considering how drawing that conclusion on Plaintiff's behalf as a white male was offensive and indicative of discriminatory

prejudices.

126.    Dr. Bolton reiterated his support for Dr. Grandieu and her conduct, and, when the conversation became uncomfortable, he quickly left the room.

127.    Shortly following that meeting, Plaintiff learned for the first time that Dr. Bolton had decided not to promote her to the role of Vice President of Student Experience, Diversity, Equity, and Inclusion ("VPSE"), which is what they had discussed over a year before. Instead, Dr. Bolton had decided to enact a nationwide search for candidates.

128.    Dr. Bolton claimed to Plaintiff that the reason for suddenly deciding to conduct a nationwide search was that teaching faculty would supposedly be upset if they were not allowed to give their input on VPSE candidates, referencing a history of faculty concerns around having input in the search for an Executive Dean position as an example.

129.    Though Dr. Bolton tried to convince Plaintiff that the nationwide search was not a big deal, Dr. Bolton's changed decision was a transparent effort to replace her under the guise of eliminating the CDO role, while bringing in an external candidate to fill the VPSE position.

130.    Plaintiff had even recently confirmed with Kim Hennessy, Pikes Peak State College's Vice President of Human Resources, that Dr. Bolton could promote her, change her title, and increase her compensation to the VPSE position at his discretion.

131.    Plaintiff had also shared with Ms. Hennessy her concerns around Dr. Bolton's dismissal of her reports of discrimination; though the College did not take any steps to promptly or appropriately investigate or address her concerns.

132.    The next day, May 12, 2023, Plaintiff sent Dr. Bolton an email following up on what had been discussed during their one-on-one meeting. Plaintiff was transparent about her

disappointment that the decision had been made to add additional staff and funding to a new role, rather than to give her the support staff she had been requesting for close to two years at that point.

133.     Keeping in mind what Ms. Hennessy had told her, Plaintiff also pushed back on Dr. Bolton's rationale for engaging in a nationwide search rather than promoting her into the VPSE role like they had previously discussed, noting that, unlike the Executive Dean position, the VPSE would not primarily affect only teaching faculty. Rather, the VPSE would rely on support from many existing relationships within the larger campus—relationships that Plaintiff had already built with people who strongly supported her staying at the College.

134.     Furthermore, as Plaintiff was already managing nearly all the responsibilities outlined in the job posting for the new VPSE role, she expressed concerns that the decision to engage in an external search was retaliatory and "punitive."

135.     Plaintiff concluded, "I would be successful and could excel in the VP role if you provided an opportunity with the same resources we plan to offer a new person."

136.     On or about May 25, 2023, Plaintiff received her performance evaluation for the 2022-2023 school year from Dr. Bolton.

137.     For the first time in Plaintiff's nearly decade-long tenure with the College, she received an overall rating below "exemplary."

138.     Plaintiff's worst rating was in the category of "Interpersonal Skills and Communication," where Dr. Bolton gave her the lowest possible rating, a "needs improvement."[1]

---

[1] A rating of "needs improvement" is described as "Performance fails to completely meet the requirements establish of the job. Goals are not consistently achieved."

139.    In several other categories, Dr. Bolton gave Plaintiff a "commendable"[2] rating, including in "Leadership," "Customer Service," and "Supports Strategic Plan, College Values, and Team Participation."

140.    Dr. Bolton rated Plaintiff's overall performance as "Commendable."

141.    Although this rating would seem to indicate Plaintiff was meeting Defendants' performance expectations, Dr. Bolton had previously shared in an executive meeting that 95-96% of all College employees received "exemplary" performance reviews, and that those who were not performing well received "commendable" ratings.

142.    Thus, Plaintiff's rating was, based on her own, and Dr. Bolton's stated perspective, a negative one.

143.    Plaintiff was the only executive team member to receive a "commendable" rating on her annual review.

144.    In Dr. Bolton's evaluation of Plaintiff, he also cited to comments from a climate survey the College had engaged in as evidence of Plaintiff's supposed deficient performance.

145.    In an executive leadership meeting after the climate survey was released, Dr. Bolton had referred to the survey as "unfruitful" and "not helpful at all" in determining the real feelings of stakeholders on campus and stated that he wished the College could "just do away with it."

146.    However, Dr. Bolton used the climate survey he had described as "not reflective of the work being accomplished by the leadership team" as support for his claim that Plaintiff's work in the CDO role had contributed to a decline in DEI satisfaction from 2021-2022, even though

---

[2] A rating of "commendable" is described as "Performance meets the basic requirements of the job. Goals, accomplishments, and expected results are achieved."

Plaintiff's actual efforts throughout that year had been well-received throughout the College. Rather than basing Plaintiff's performance evaluation on whether Plaintiff achieved the goals and objectives outlined for her position, Dr. Bolton instead used the evaluation to penalize Plaintiff as a result of her speaking out about her own concerns of discrimination related to Dr. Bolton and Dr. Grandieu.

147.    For instance, in addition to failing to note that Plaintiff had achieved all of the goals outlined by Dr. Bolton the previous year, the evaluation also left out a significant number of Plaintiff's accomplishments and initiatives over the course of 2022-2023 academic year.

148.    These included the development of equity in instruction programming, her efforts to make the College a leader as an emerging HSI, and her work with CCCS and the human resources department at PPSC to put inclusive hiring practices in place.

149.    Specifically, Plaintiff had worked with College stakeholders for nearly a year on system-wide training to reduce biases in hiring practices, which was successfully rolled out to the College's entire system.

150.    In sum, the evaluation was a blatant effort to discount and disregard the work Plaintiff had done in order to create a paper trail in an attempt to support the College's failure to promote her into the VPSE role, while eliminating her position as CDO.

151.    In response to her first-ever negative evaluation, Plaintiff sent Dr. Bolton an email raising concerns that the evaluation was retaliatory in response to her reports of discrimination.

152.    Plaintiff specifically highlighted the fact that Dr. Bolton had never even hinted at a supposed concern around her communication style (as opposed to Dr. Bolton's repeated dismissiveness toward the substance of what Plaintiff communicated when she expressed concerns

of discriminatory prejudices), despite the fact that they met almost every week. Plaintiff continued:

> Each time [I raised concerns of discrimination], I hesitated to share authentically out of fear of retaliation. I had never challenged anything that you said, so I thought that we would work together for you to understand my experiences and how they were significantly different than yours and other members of the team. But when you shared the sudden interest in changing the CDO to a VP role even though I had been making that recommendation for nearly 18 months, that is when I figured that this change presented you with an opportunity to write me out of the position while also avoiding having a challenging dialogue on the concerns of inequitable or disparaging [treatment] I have been bringing to your attention.
>
> The problems/topics that I was sharing made you uncomfortable. I am drawing that conclusion because we have never discussed them or the impact of my feeling of being dismissed, microaggressions, and microinvalidations, including feeling like I was being stripped of my identity and culture as a black woman.
>
> …
>
> As I shared, there is a bevy of literature about women of color in executive leadership in higher education and how we are treated differently when we disagree with our white colleagues. The more productive thing could have been for you and me to work together by you asking questions and helping address my concerns about disparaging treatment[.]

153.    The following day, May 26, 2023, Plaintiff and Dr. Bolton had a one-on-one meeting to discuss her performance evaluation.

154.    During that meeting, Dr. Bolton, in defending his low rating of Plaintiff's interpersonal skills and communication, repeatedly described Plaintiff's reports of discrimination regarding Dr. Grandieu as merely a "squabble" between employees.

155.    Dr. Bolton continued, explicitly stating he did not feel it was a good use of his time to get involved in what he portrayed as merely a clash of personalities among his direct reports.

156.    Plaintiff, taken aback by his incredibly dismissive and offensive characterization of

her reports of discrimination, tried to impress the seriousness of the situation upon Dr. Bolton.

157.    Plaintiff explained that Dr. Bolton's representation of her lived experience of discrimination as nothing more than "a squabble" was exactly why she felt the evaluation was retaliatory—because he did not take her reports of discrimination seriously and therefore viewed them as a "communication issue" for which he then exclusively blamed Plaintiff.

158.    Rather than listening to the first Black woman on his executive team, a woman with over 25 years of experience in DEI work and impressive academic credentials, Dr. Bolton dismissed her concerns, every single time.

159.    Following her conversation with Dr. Bolton, Plaintiff reached out to Ms. Hennessey in human resources. Plaintiff explained the situation, including that her reports and requests for support around discriminatory behavior were ignored by Dr. Bolton, other than resulting in a retaliatory, negative evaluation and the decision to change the CDO position to a VP position into which Dr. Bolton now refused to promote Plaintiff. Plaintiff continued:

> I believe the retaliatory treatment I have been experiencing lately is an attempt to terminate my employment indirectly…. What is happening to me now in my annual evaluation and termination of my role at the college are examples of discrimination, prejudice, and biased comments that are subjective and unsubstantiated. My experiences with microaggressions and microinvalidations are authentic to me, and just because Dr. Bolton and [Dr. Grandieu] don't feel they are engaging in discrimination doesn't mean they aren't.

160.    In the email to Ms. Hennessy, Plaintiff also raised several specific examples of the ways in which she had been discriminated against by Dr. Bolton and the College.

161.    Plaintiff compared her experience to that of James Mancall, a white male, who was promoted from Executive Director of Strategic Initiatives into the PPSC Chief of Staff role.

162.    When Mr. Mancall was promoted, the College simply announced he was being

moved into the new role in a transparency posting, rather than engaging in a nationwide search.

163.    Likewise, Dr. Grandieu had an Assistant Director position for which she was permitted to promote a team member by making only a transparency posting, rather than engaging in a nationwide search.

164.    Plaintiff was not being given the same opportunity, despite Dr. Bolton's stated plan to promote Plaintiff into a VP position for her role.

165.    Plaintiff requested Ms. Hennessey's help in submitting a more formal complaint of discrimination and/or retaliation against the College and Dr. Bolton.

166.    On May 30, 2023, Plaintiff submitted a complaint of discrimination against the College and Dr. Bolton through the College's internal complaint system, Maxient.

167.    Once again, Plaintiff voiced her discrimination concerns around her retaliatory evaluation, the dismissal of her previous discrimination complaints by Dr. Bolton and human resources, and the fact that she was being indirectly replaced in retaliation for her protected complaints.

168.    Once again, Plaintiff recounted the discriminatory treatment she experienced from Dr. Grandieu, noting that, despite Dr. Bolton's categorical defense of Dr. Grandieu, other employees of color had experienced similar behavior from her.

169.    In the Maxient complaint, Plaintiff explained, "[Dr. Bolton] totally dismissed my complaint and never provided a resolution because of his favorable perception of my colleague, [Dr. Grandieu]. So his recommendation for my discrimination complaint was to change my approach to accommodate my white colleague."

170.    Plaintiff noted that she had approximately 7-10 people who were able to back up

her claims of discriminatory treatment that went unaddressed by Dr. Bolton and the College.

171.    Plaintiff also shared that she had witnessed firsthand the discriminatory treatment of other non-white employees.

172.    However, without ever bothering to take appropriate or prompt steps to investigate Plaintiff's discrimination complaint, Defendants terminated Plaintiff.

173.    Specifically, on May 31, 2023, the day after Plaintiff submitted her more formal discrimination complaint through Maxient, the College sent Plaintiff a termination later, which claimed that the reason for her termination was the supposed elimination of the CDO role. The letter stated Plaintiff's last day of employment would be July 31, 2023, and it was signed by Dr. Bolton.

174.    Plaintiff's termination letter also outlined a plan for reallocating Plaintiff's job responsibilities to the VPSE role.

175.    Plaintiff never heard anything from the College regarding her first formal complaint regarding discrimination and retaliation, so, on June 28, 2023, she resubmitted the report.

176.    In Plaintiff's second report, she explained how the lack of follow-through on the part of the College demonstrated why "there is a broader sense of lack of trust in this 'internal' process and no sense of urgency[.]"

177.    Defendants never responded to Plaintiff's second complaint either.

178.    On Plaintiff's last day of work, July 31, 2023, the College made no announcement about her departure. After being a highly valued employee of the College for almost ten years, Plaintiff did not get so much as a farewell email from the College. Rather, Plaintiff individually received phone calls, text messages, and letters from supportive colleagues who were shocked

about her termination.

179.    Meanwhile, Dr. Bolton assuaged several employees who were initially upset in learning the CDO position was being eliminated by assuring them that Plaintiff was the "best fit" for the VPSE role, though Dr. Bolton and the College did not genuinely intend to offer Plaintiff that position due to her protected classes, and/or in retaliation for her protected reports of discrimination.

180.    Plaintiff interviewed for the VPSE role and, although she made it to the final round of interviews, she was not selected for the position.

181.    In an August 17, 2023, email to Ms. Hennessey, Plaintiff asked Ms. Hennessey to confirm "that I told you on several occasions that Dr. Bolton wasn't going to hire me and that the job abolishment was in retaliation."

182.    Plaintiff also shared with Dr. Ryan Ross that she was not selected for the role despite his and the search committee's recommendations.

183.    The College also made no announcement about the candidate it hired for the VPSE role, Dr. Enrique Romo, at the time he was hired. The College issued only a vague announcement several months later that avoided highlighting that Dr. Romo has a healthcare background and no experience working with community colleges.

184.    Plaintiff additionally reached out to Chancellor Garcia by email on August 21, 2023. Yet again, she outlined the discrimination she experienced from Dr. Bolton, Dr. Grandieu, and the failure of the College's human resources department to engage in any meaningful investigation of her complaints.

185.    Chancellor Garcia gave no meaningful response. He told Plaintiff that he does not

get involved with personnel matters and simply forwarded her back to Christina Cecil, the Chief Human Resource Officer for the College, and the same human resources department that had already ignored Plaintiff's reports multiple times.

186.    Instead of listening to Plaintiff when she said she was experiencing discrimination, at every opportunity, Defendants degraded her, invalidated her concerns, minimized Dr. Bolton's responsibility to act and his own conduct, and ultimately retaliated against Plaintiff because she is a Black woman who dared to speak out about her own experiences of discrimination at work.

**FIRST CLAIM FOR RELIEF**
**Discrimination and Hostile Work Environment Based on Race, Ancestry, Ethnicity, and/or Ethnic Traits in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Pursuant to 42 U.S.C. § 1983)**
**(Against All Defendants)**

187.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

188.    42 U.S.C. § 1981 prohibits discrimination in the making and enforcement of contracts and is designed to include a remedy against discrimination in employment on the basis of race, ancestry, ethnicity, and/or ethnic traits.

189.    Under Section 1981:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

190.    Employment contracts are among those contracts protected by Section 1981.

191.    On or about May 1, 2015, Defendants entered into a contract with Plaintiff that is subject to Section 1981.

192.    Plaintiff is a member of a protected class because she is Black.

193.    Defendants treated Plaintiff differently, and created an intimidating, hostile, and offensive working environment, which interfered with Plaintiff's ability to do her job, and terminated Plaintiff, denying Plaintiff full and equal benefit of all laws based on her race, ancestry, ethnicity, and/or ethnic traits, unlike similarly situated employees outside of Plaintiff's protected classes.

194.    Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under Section 1981 based on Plaintiff's race, ancestry, ethnicity, and/or ethnic traits.

195.    Defendants' harassment and disparate treatment toward Plaintiff that was aimed at Plaintiff because of her race, ancestry, ethnicity, and/or ethnic traits resulted in adverse impacts to the terms and conditions of Plaintiff's employment and further subjected Plaintiff to pervasive harassment amounting to a hostile work environment.

196.    At the time the above-described conduct occurred and, as a result of such conduct, Plaintiff believed her work environment to be hostile or abusive.

197.    Defendants knew of the abusive conduct and hostile environment perpetrated by executive leadership, including Dr. Bolton, and failed to take any prompt or appropriate remedial action to stop such conduct.

198.    Moreover, Defendants are directly liable for the hostile work environment created and maintained by its supervisory level employees, including Dr. Bolton, among others.

199.    As such, Defendants violated 42 U.S.C. § 1981 and discriminated against Plaintiff by not only subjecting her to sufficiently severe or pervasive harassment based on her race so as

to alter the conditions and terms of Plaintiff's employment, but also by failing to act and condoning or tolerating such harassment; and subjecting Plaintiff to less favorable terms and conditions of employment, including degrading comments and conduct based on Plaintiff's race and/or color, and ultimately terminating Plaintiff's employment.

200.    The reasons Defendants submit for subjecting Plaintiff to disparate terms and conditions of employment and terminating Plaintiff, if any, are false and pretexts for unlawful discrimination.

201.    But-for Plaintiff's race, ancestry, ethnicity, and/or ethnic traits, Defendants would not have eliminated Plaintiff's position, terminated Plaintiff's employment, and/or failed to promote or hire Plaintiff for its VPSE position.

202.    Defendant Dr. Bolton personally participated in the unlawful employment decisions taken against Plaintiff, as described herein; and Defendant Dr. Bolton therefore has a sufficient connection with the unlawful employment decisions taken against Plaintiff.

203.    Upon information and belief, at all times relevant, Dr. Bolton had and has the ability to effectuate the prospective relief sought by Plaintiff.

204.    Plaintiff's right to be free from discriminatory treatment was clearly established at all times relevant, which Defendant Dr. Bolton knew or should have known.

205.    In unlawfully discriminating and retaliating against Plaintiff, Defendants acted intentionally or in the face of a perceived risk that its decisions would violate federal law, thereby necessitating the imposition of punitive damages.

206.    As a direct and proximate result of Defendants' acts or omissions, Plaintiff suffered loss of income, emotional pain and suffering, embarrassment, and inconvenience. She is therefore

entitled to general and special damages, economic damages, punitive damages, and reasonable attorneys' fees and costs (including expert witness costs) as permitted by law.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of Section 1981, 42 U.S.C. § 1981, Pursuant to 42 U.S.C. § 1983)
### (Against All Defendants)

207.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though set forth fully and separately herein.

208.    Plaintiff engaged in activity protected by Section 1981 when she reported in good faith her reasonable belief that she was being subjected to unlawful harassment and discrimination based on her race and/or color on numerous occasions, including, but not limited to, on February 14, 2023; April 18, 2023; April 30, 2023; May 11, 2023; May 25, 2023; May 26, 2023; May 30, 2023; and June 28, 2023.

209.    Plaintiff's reports of her own experiences and concerns of discrimination and retaliation at the hands of her direct supervisor, Dr. Bolton, and Dr. Grandieu, as well as the College's failure to appropriately respond to or handle her reports, was protected activity under Section 1981, in that Plaintiff was acting above and beyond her required job duties as CDO. Plaintiff also was required to step outside her job description when she repeatedly but respectfully disagreed with Dr. Bolton's dismissiveness to her experiences and his insistence that she was not experiencing discrimination, as well as the College's failure to take any appropriate action in response to her reported concerns.

210.    Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment by eliminating the CDO position and terminating her employment on May 31, 2023,

refusing to hire and/or promote Plaintiff to the VSPE position, and by subjecting her to further harassment because she engaged in the above-described statutorily protected activities.

211.    A casual connection exists between Plaintiff's protected activities and Defendants' unlawful retaliation.

212.    Defendant Dr. Bolton personally participated in the unlawful employment decisions taken against Plaintiff, as described herein; and Defendant Dr. Bolton therefore has a sufficient connection with the unlawful employment decisions taken against Plaintiff.

213.    Upon information and belief, at all times relevant, Dr. Bolton had and has the ability to effectuate the prospective relief sought by Plaintiff.

214.    Plaintiff's right to engage in the herein-described protected conduct without being retaliated against was clearly established at all times relevant, which Defendant Dr. Bolton knew or should have known.

215.    Defendants' above-described retaliatory conduct, including Defendants' termination of Plaintiff, is the type that would be materially adverse to a reasonable employee and chill such employee's willingness to engage in protected activity, such as opposing discrimination by making internal reports of same.

216.    In unlawfully discriminating and retaliating against Plaintiff, Defendants acted intentionally or in face of a perceived risk that their decisions would violate federal law, thereby necessitating the imposition of punitive damages.

217.    As a direct and proximate result of Defendants' above-described acts or omissions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages,

economic damages, punitive damages, and attorneys' fees and costs (including expert witness costs) as permitted by law.

### THIRD CLAIM FOR RELIEF
**Discrimination and Harassment based on Race, Color, and/or Gender in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq*. ("CADA")**
**(Against Defendant SBCCOE)**

218.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though set forth fully and separately herein.

219.    At all times relevant to this Complaint, Plaintiff was an "employee" as defined by C.R.S. § 24-34-401(2).

220.    At all times relevant to this Complaint, Defendant SBCCOE was an "employer" as defined by C.R.S. § 24-34-401(3).

221.    CADA makes it "an unlawful employment practice for an employer […] to discharge, to promote or demote, to harass during the course of employment, or to discriminate in matters of compensation, terms, conditions, or privileges of employment against any individual otherwise qualified because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, religion, age, national origin, or ancestry." C.R.S. 24-34-402(1)(a).

222.    Plaintiff is a member of a protected class because she is a Black woman.

223.    Plaintiff was qualified for the position she held with Defendant.

224.    Plaintiff was further qualified for the VPSE position.

225.    Plaintiff applied for the VPSE position.

226.    Based on the above-described acts, practices, and omissions, Defendant SBCCOE engaged in unlawful discrimination under CADA based on Plaintiff's race, color, and/or gender.

227.    The conduct of individuals at SBCCOE, including Dr. Bolton's conduct, was subjectively and objectively abusive, pervasive, intimidating, hostile, and humiliating; and it altered the terms and conditions of Plaintiff's employment and created a hostile work environment.

228.    Defendants knew of Plaintiff's reports of discrimination, yet Defendants failed to take any prompt or appropriate remedial action to address or stop such conduct. The harassment and race-related treatment Plaintiff was subjected to was ongoing, persistent, and continuous.

229.    Defendant SBCCOE is vicariously liable for the hostile work environment Plaintiff experienced at the hands of Defendants' managers, such as Dr. Bolton.

230.    As such, Defendant SBCCOE violated C.R.S. 24-34-402(1)(a) and discriminated against Plaintiff by failing to act and condoning or tolerating such discrimination; subjecting Plaintiff to less favorable terms and conditions of employment; eliminating Plaintiff's role and ultimately terminating Plaintiff's employment, and refusing to hire and/or promote Plaintiff into the VPSE position.

231.    The reasons Defendant submit for subjecting Plaintiff to disparate terms and conditions of employment, eliminating the CDO role, refusing to hire and/or promote Plaintiff into the VPSE position, and terminating Plaintiff, if any, are false and pretexts for unlawful discrimination.

232.    Defendant's actions were intentional and committed with malice or reckless indifference to Plaintiff's rights under CADA.

233.    As a direct and proximate result of Defendant's actions, Plaintiff suffered damages, including loss of income, emotional pain and suffering, embarrassment, and inconvenience.  She

is therefore entitled to general and special damages, economic damages, and reasonable attorneys' fees and costs as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401**
**(Against Defendant SBCCOE)**

234.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though set forth separately and fully herein.

235.    CADA prohibits discriminating "against any person because such person has opposed any practice made a discriminatory or unfair employment practice" under CADA. C.R.S. 24-34-402(1)(e)(IV).

236.    The termination of an employee soon after they engaged in protected activity generally raises an inference of retaliation. *See Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1191 (10th Cir. 2016); *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999); *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996); *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).

237.    Plaintiff engaged in activity protected by CADA when she reported in good faith her reasonable belief that she was being subjected to unlawful harassment and discrimination based on her race, color, and/or sex on numerous occasions, including, but not limited to, on February 14, 2023; April 18, 2023; April 30, 2023; May 11, 2023; May 25, 2023; May 26, 2023; May 30, 2023; and June 28, 2023.

238.    Plaintiff's reports of her own experiences and concerns of discrimination and retaliation at the hands of her direct supervisor, Dr. Bolton, and Dr. Grandieu, as well as the College's failure to appropriately respond to or handle her reports, was protected activity under

the CADA, in that Plaintiff was acting above and beyond her required job duties as CDO. Plaintiff also was required to step outside her job description when she repeatedly but respectfully disagreed with Dr. Bolton's dismissiveness to her experiences and his insistence that she was not experiencing discrimination, as well as the College's failure to take any appropriate action in response to her reported concerns.

239.    Defendant SBCCOE unlawfully retaliated against Plaintiff by subjecting her to further harassment, eliminating the CDO role, refusing to hire and/or promote Plaintiff to the VPSE position, and terminating Plaintiff's employment because she engaged in the above-described protected activities.

240.    A casual connection exists between Plaintiff's protected activities and Defendant SBCCOE's unlawful retaliation.

241.    Defendant's actions were intentional and committed with malice or reckless indifference to Plaintiff's rights under CADA.

242.    As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, and attorneys' fees and costs as permitted by law.

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Unlawful Employment Practices in Violation of CADA,
C.R.S. 24-34-401, *et seq.*
(Against Defendant Lance Bolton)**

243.    Plaintiff incorporates by reference the above paragraphs of this Complaint as though set forth separately and fully herein.

244.    SBCCOE engaged in acts defined by the Colorado Anti-Discrimination Act to be discriminatory or unfair employment practices, including, but not limited to, discriminating against Plaintiff based on her race, color, and/or sex and retaliating against Plaintiff for engaging in protected opposition to the discriminatory acts of the College.

245.    Dr. Bolton knowingly aided, abetted, incited, compelled, or coerced SBCCOE to engage in those acts by, among other things, directly discriminating against Plaintiff in the terms, conditions, and privileges of her employment and retaliating against Plaintiff after she engaged in protected activity related thereto, culminating in the elimination of the CDO role, SBCCOE's failure to hire and/or promote Plaintiff into the VPSE position, and Plaintiff's unlawful termination.

246.    Dr. Bolton's above-described conduct was willful and wanton, and/or committed with reckless indifference to Plaintiff's protected rights.

247.    Because Dr. Bolton aided, abetted, incited, compelled, or coerced SBCCOE to engage in acts defined by the CADA to be discriminatory or unfair employment practices, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses; and she is entitled to such general and special damages, economic damages, and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants, and order the following relief:

A.    All appropriate declaratory and injunctive relief;

B.    Award Plaintiff's economic damages, as established at trial, including back pay and

front pay damages;

C.      Award Plaintiff's compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, humiliation, and degradation;

D.      Award Plaintiff punitive damages for Plaintiff's claims, as permitted by law;

E.      Award Plaintiff her attorneys' fees and costs incurred in this action;

F.      Award Plaintiff statutory pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Award such other relief as this Court deems equitable, appropriate, and just.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury.


Respectfully submitted this 15th day of January, 2025.


**HKM EMPLOYMENT ATTORNEYS LLP**


By: *s/ Abby Zinman*
　　　Shelby Woods
　　　Abby Zinman
　　　HKM Employment Attorneys LLP
　　　518 17th Street, Suite 1100
　　　Denver, Colorado 80202
　　　Telephone: (720) 668-8989
　　　swoods@hkm.com
　　　azinman@hkm.com
　　　*Attorneys for Plaintiff Tiko Hardy*